CITY OF PHILADELPHIA v. WESTERN UNION TEL. CO.

(Circuit Court of Appeals, Third Circuit. August 4, 1898.)

1. MUNICIPAL CORPORATIONS—TAXATION OF TELEGRAPH COMPANY.
   A city may lawfully impose a license tax upon the poles and wires of a telegraph company maintained within its limits to cover the expense to which it is put in the enforcement of its police regulations by reason of the existence of such poles and wires, though the company is a corporation of another state, and engaged in interstate commerce.

2. SAME—REASONABLENESS OF TAX—REVIEW BY COURTS.
   Whether a license tax imposed by a city on the poles and wires of a telegraph company is reasonable in amount may be the subject of judicial inquiry, and is a proper question to be determined by a jury where it arises in an action at law.

3. SAME—SCOPE OF INQUIRY—EVIDENCE.
   A court, however, is authorized to set aside an ordinance imposing such a tax only when the discretion vested in the legislative department of the city has been manifestly abused; and, in determining that question, a wide latitude should be allowed in the introduction of evidence. In addition to the cost of inspection required by the ordinances, testimony tending to show that an increase in the force and apparatus of the fire department had been rendered necessary by the maintenance of such poles and wires is proper to be considered, as well as evidence that extra meetings of the councils have been required for the purpose of regulating their erection and maintenance.

In Error to the Circuit-Court of the United States for the Eastern District of Pennsylvania.

This was an action brought by the city of Philadelphia against the Western Union Telegraph Company to recover the amount of certain charges alleged to be due the city under ordinances thereof relating to the maintenance of poles and wires in the streets. The action was commenced December 31, 1891, in the court of common pleas No. 4 for the county of Philadelphia, Pa., where the plaintiff's declaration was filed, and on March 5, 1892, upon petition of the defendant, was removed into the circuit court of the United

States for the Eastern district of Pennsylvania, in which court the defendant filed its plea of nonassumpsit; and proceedings were had which resulted in the entry of a judgment on July 16, 1897, in favor of the defendant. The case is here upon writ of error sued out by the plaintiff.

In the declaration and specifications, the plaintiff showed that on December 21, 1880, an ordinance was passed by the proper authorities of the city of Philadelphia, entitled "An ordinance to provide for the payment of an annual charge for the use of telegraph poles belonging to the city of Philadelphia, and to carry the same into effect." That on January 6, 1881, an ordinance was passed entitled "An ordinance to regulate the erection and maintenance of telegraph poles in the corporate limits of the city of Philadelphia," commencing as follows, viz.: "Whereas, great inconvenience and annoyance have been occasioned to property owners by the placing of telegraph poles in front of their premises; and whereas, the lives and property of citizens traveling upon the public streets and highways have been imperiled by the erection and maintenance of inadequate or unsound telegraph poles thereon, so that it has become necessary to establish a system for the proper inspection of such poles and for the erection and maintenance thereof: Therefore," etc.,—ordaining that the corporation, firm, or individual maintaining telegraph or telephone poles should obtain yearly a license from the superintendent of police and fire alarm telegraph for the maintenance thereof, and ordaining further as follows: "The charge for issuing such license shall be the sum of one dollar for each and every pole authorized to be maintained thereby, and shall be paid to the city treasurer for the use of the said city." That on March 30, 1883, an ordinance was passed, entitled "An ordinance to regulate the introduction and use of underground conduits, wires, and cables for electrical conductors in the streets of the city of Philadelphia, and to provide for charges for underground, overground, or overhead wires," etc., whereby it was ordained among other things, that all corporations, firms, or persons having telegraph, telephone, or electric lighting wires, electric conductors, or cables or poles or fixtures, or over house tops, or in any way suspended above ground or placed underground, should make annually a return in writing of the number and location of wires, number of miles of wire, etc., and "that on all conductors or wires suspended above ground, excepting such as are used or owned by the city of Philadelphia, an annual payment * * * of two dollars and fifty cents per mile or part thereof in length or wires or conductors for each and every wire or conductor used or to be used for telegraphic * * * purposes * * * shall be paid to the city treasurer." etc. The plaintiff averred that the defendant had maintained within the corporate limits of the city of Philadelphia, in the years 1885, 1886, and 1887, 1,349 poles; in the years 1888 and 1889, 1,338 poles; and in the year 1890, 910 poles; and had maintained, on poles and buildings, in the year 1885, 756 miles of wire; in the years 1886, 1887, 1888, and 1889, 768 miles of wire; and in the year 1890, 787 miles of wire; and that by reason thereof, and by force of the said ordinances of 1881 and 1883, the defendant was indebted to the plaintiff in the sum of $19,170.50, with interest. The plaintiff further claimed the sum of $45 as the aggregate of charges due, under the said ordinance of 1880, for attachments of wires to poles owned by the city. In its affidavit of defense, the defendant company, by W. B. Gill, superintendent, averred that the said sum of $45 had been paid, and that, as to the amounts claimed for the years 1885, 1886, 1887, and 1888, the same charges for the same years were sought to be recovered in another suit brought by the city against the company in the said court of common pleas, at the June term, 1888, and thereafter removed into the said circuit court of the United States, in which suit judgment was rendered in favor of the company. The defendant company further averred that it was a corporation duly organized under the laws of the state of New York, with power to construct, maintain, and operate lines of telegraph in and through the various states and territories of the United States, and that, on June 5, 1867, it duly accepted the provision of the act of congress approved July 24, 1866, entitled "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes," and on June 8, 1867, filed its writ-

ten acceptance of the restrictions and obligations required by the said act of congress with the postmaster general of the United States; that by virtue of the said act of congress, and under the authority thereof, the company, during all the time for which the said charges were sought to be recovered, lawfully owned, controlled, maintained, and operated lines of telegraph within the state of Pennsylvania, of which lines the said wires and poles erected and maintained within the limits of the city·of Philadelphia formed a part, connecting with and forming parts of lines of telegraph extending between all the states of the United States and the territories thereof; that during all the said time the defendant used and operated the said lines for the transmission, by electricity, of intelligence between the states, and to and from the city of Philadelphia, from and to points within other states and territories, which communication of intelligence was commerce between the states; that the charges sought to be imposed by the said ordinances were laid for the purpose of producing, and would produce, revenue to the city over and above the cost of regulating and supervising the poles and wires above mentioned, and the costs of issuing licenses therefor; that the charges were unreasonable, and were in amount more than 10 times the cost of regulating and supervising the poles and wires and issuing licenses therefor, and hence constituted a tax on the poles and wires upon which they were sought to be imposed; that the ordinances were void and of no effect, because the city had no authority to impose a tax upon the poles and wires, and because the ordinances were in conflict with the provision of the constitution of the United ·States conferring upon congress the power to regulate commerce with foreign nations and among the several states. The defendant further averred that it had already paid to the commonwealth of Pennsylvania all taxes upon the value of the said poles and wires, as included in and represented by its capital stock, and upon the gross receipts derived from the use thereof, as provided by the laws of the state, and which had been assessed thereon.

The case ·was tried in the said circuit court of the United States before the court and a jury. The plaintiff confined its demand to the charges for the years 1889 and 1890, and put in evidence the returns made by the company for those years, as required by the said ordinances, showing the maintenance by the company of 1,338 poles and 768 miles of wire during the year 1889, and 910 poles and 787 miles of wire during the year 1890. The amounts claimed, therefore, were $1,338 and $1,920 for the former year, and $910 and $1,967.50 for the latter, aggregating the sum of $6,135.50. The plaintiff also put in evidence the said ordinances of 1881 and 1883. With this evidence the plaintiff rested. The defendant company introduced in evidence in its behalf the charter of the company, a certified copy of the acceptance by the company of the provisions of the said act of congress, and the certificate of the postmaster general of the United States for the years 1889 and 1890, stating and fixing the rates to be allowed the ·company for the transmission of messages of the United States; also, a statement of the number of telegraph poles and miles of wire belonging to the city of Philadelphia, erected and maintained in and over the streets thereof during the years 1889 and 1890, as follows, viz.: 1889, number of poles 5,117, miles of wire 903¾; 1890, number of poles 5,309, miles of wire 758. The only witness on behalf of the defendant was W. B. Gill, superintendent of the company for the "Sixth District," which was described by him as extending from the Potomac river to the Allegheny mountains, and from the state line of New York to the state lines of Maryland and West Virginia. He had been the company's superintendent for territory inclusive of the city of Philadelphia since the year 1879, and in the employ of the company since 1863. He testified that the wires of the company in that city were used in interstate and foreign communication, and that the greater part of the government's cable business passed over them. "As to inspection," the witness said, "we have always understood that the linemen employed by the city, in their general rounds in the attention to their own matters, wherever they notice any of our poles out of shape or out of line or that need renewing, call our attention to it, just the same way as our linemen. We have employed here at Philadelphia, for our purposes, three linemen. Those men are sent out to mend a broken wire or to remove a cross, and if, while out on their service,

they noticed anything wrong with the line, they would make a report of it. It is like as if you were walking along the street, and saw something wrong yourself, and knew the party; you would call their attention to it. That is, in general, what you might call 'inspection.' As to any general inspection of lines, there is none made by us, and we do not think there is any made by the city, for the reason that there is no necessity for such a thing." The witness stated that he did not recollect that within the past five years the company had received from the city as many as fifteen notices to repair a pole or wire. No one could ascertain, except by climbing a pole, and examining the attachments, whether a wire was or was not in a safe condition. It was a practical impossibility to ascertain the condition of a wire by looking at it from the street. Before the introduction of the electric light and the trolley lines, there was no danger arising from broken telegraph wires. A telegraph wire might become a conductor for an electric light current by coming in contact with a light wire. He further stated that in the city of Philadelphia the average number of company's poles per mile of its line was about 37, and the average number of wires to the pole at least 20. "The cost per annum of maintaining the [company's] plant, including the material and the labor,—and that labor, of course, removes all the crosses and any of the wires that are broken, and also does the office work, and if any of the wires are knocked down by falling timber, or from heavy storms, sleet, or otherwise, the refurnishing of that,—averages, and has for a number of years in this district, from $2.66 per mile to $2.90, per annum;" that is to say, from $2.66 to $2.90 per mile of wire per annum. On the basis of 37 poles to the mile, and 20 wires to the pole, the amount charged by the city for inspection, under the ordinances in question, would be $37 for pole charges, and $50 for wire charges, aggregating $87, or $4.35 per mile of wire per annum. On cross-examination, Mr. Gill said he did not recollect that in 20 years any one had been injured in the city by falling poles of the defendant company. As to induced currents, no additional inspection was necessary to guard against them. By the rules of the city's electrical bureau, wires were not permitted to be placed within two feet of each other. With wires at such distance, there was no practical inconvenience from induction. A sudden frost did not break many telegraph wires, but a heavy sleet storm would break them. Such a storm did not occur more than once or twice a year. The electric light wires were charged with a current of nearly 3,000 volts. If a broken telegraph wire should fall across an electric light wire, and cut through the insulation, the telegraph wire would become a conductor for the light current. If the telegraph wire should then come in contact with something furnishing a strong electrical resistance to the current, a fire or death would result. If the current had resistance by a live human body, death would result; but, if there was no resistance, the telegraph wire would be melted. If a person should touch the wire, it would kill him. There had been such occurrences in the city. Fires would not be caused in telegraph offices by telegraph wires carrying electric light currents. Such results were guarded against by the use of a protector on each wire. In the course of the cross-examination the witness was interrogated by counsel as follows: "Q. There have been quite a number of ordinances, have there not [concerning the subject of electric wires]? A. Yes, sir. Q. Therefore, such expense as the city incurs in connection with the meeting of its councils goes towards the regulation of electric wires?" These questions were objected to by the defendant's counsel, and, upon a negative answer by counsel for the plaintiff to the court's inquiry whether specific proof was intended to be made of the actual cost of passing ordinances, the court said: "The clear statement that counsel had made, by whom the question is asked, indicates that the object is to in some manner apportion the general expenses of the legislative department of the municipal government of Philadelphia with respect to the passage of particular ordinances relating to electric wires, and the court holds that it is too remote, vague, and uncertain to be admissible." An exception was noted for the plaintiff. Upon redirect examination the witness stated that, from his experience and knowledge of the matter, his judgment was that the issuing of permits and the inspection and super-

vision of the telegraph lines did not cost the city over 50 cents per pole; that 50 cents would be a liberal amount covering the cost. This did not include any expense connected with the inspection of wires. There was no inspection of wires. No one could stand on the pavement, and tell the condition of a wire. In recross-examination he stated that in this estimate of 50 cents per pole he did not allow for inspection of wires, for the reason that there was no such inspection. The police bureau did no work in connection with wires. The witness never understood, he said, that the police had anything to do with making reports concerning the telegraph plant. They would not have intelligence that would enable them to make such reports. They might report hanging wires that they could see, but as to anything else they could not make a report for want of knowledge. They could not report very well concerning defective poles. They would not know a defective pole. In the estimate of 50 cents per pole there was nothing included for services of police officers.

In rebuttal, the plaintiff examined Abraham M. Beitler, judge of the court of common pleas No. 1 of the county of Philadelphia, who stated that he was director of public safety of the city of Philadelphia from October, 1891, until February, 1896, and that previously to 1891 he was for many years assistant in the city solicitor's office. As director of public safety, the bureaus of police, fire, health, city property, building inspection, and the electrical bureau were under his direction. Regarding the bureaus whose business has relation to the subject of telegraph poles and wires not belonging to the city, the witness said: "In a general way, the location of telegraph lines was exclusively under the jurisdiction of the electrical bureau. Their regulation was under the control of the electrical bureau. Their supervision was under the bureau of police and the electrical bureau; and, in certain contingencies in fires, the fire bureau had to do with the wires; but that was simply in the way of being relieved of an impediment that was in their way when a fire was in a street incumbered with poles and wires. * * * The electrical bureau, in the first place, issues permits for the erection of poles and the stringing of wires. Without a permit the work would be stopped by the police. In the next place, the electrical bureau looks after the financial portion; that is, the receipt for the license charges. In the third place, the electrical bureau attends to reports brought in by the police bureau that involve repairs, either by the city on her own lines or by telegraph companies throughout the city." Being interrogated as to the duties of the employés of the electrical bureau, the witness said: "In the first place, it is the duty of Chief Walker's men [of the electrical bureau] to see that the wires are run throughout the city of Philadelphia so as not to interfere one company with another, and so as not to interfere with the city's service, which, so far as the transmission of police intelligence and fire alarms is concerned, we regarded as of prime importance; and, in the next place, to see that, after those structures are put up, they are kept in good shape and condition. Then, upon occasions, Chief Walker has to do with relieving the fire bureau of all impediments in case of a fire; for instance, if an alarm of fire came in there to the electrical bureau, and its attention is directed to the fire, there is a force sent out to the scene of the fire just as the policemen and firemen are. One or more inspectors and one or more linemen will go to the scene of the fire for two purposes: First, to relieve the fire bureau from the hindrance of the wires; and, in the second place, to see that as little harm as possible is done to the service conducted through the overhead wires." With regard to the work done by the police bureau in connection with poles and wires, the witness said: "The police bureau was under me from October, 1891. I presume their duties were the same prior to that time. Every policeman, in addition to performing strictly what is police duty,—that is, arresting criminals, and maintaining the public peace on the highways,—is also an inspector, not only from the sanitary standpoint, but also from the standpoint of safety to pedestrians on the highways. He is required to report anything that he observes that may cause injury to personal property and to individuals, and he is required to make those reports as often as he observes anything that requires the attention of any bureau or department. He must report,

for instance, broken manholes, leaning telegraph poles, dangling wires, swinging signs when the supports are loose, bad pavements, holes in the sidewalk, and anything which requires the attention of the city or anybody else to insure the safety of the public, as he must also report anything unsanitary that requires the attention of the department of public works, of the bureau of health, or the department of public safety." As to whether it was the duty of police officers, prior to the time when the witness became director of public safety, to make report of the condition of affairs in the streets causing danger to travel, there was no question, the witness said, that the duty existed, and he had no doubt it was performed. The witness was not cross-examined. The plaintiff also introduced in rebuttal the testimony of David R. Walker, who stated that he had been connected with the department of public safety for over 40 years, and had been chief of the electrical bureau about 14 years. When the bureau received notice, he said, that a pole or wire was defective, they immediately had it removed. "If it is a dangling wire," he continued, "the electrical bureau removes it,—takes it out of the road. If it is a number of cases, we notify the company, whoever it belongs to. These things are reported to the bureau by the police officers and the firemen, as well as by citizens. We receive a great many complaints from citizens that there is a dangerous wire over the roof of their houses, or hanging down in front of the house. The duty of the manager in charge is to send a lineman or inspector. We most generally send a lineman to remove that wire, or see what kind of a wire it is,—whether it is an electric light wire or a telegraph or telephone wire." Currents from electric light wires were conducted into houses; and there were quite a number of cases in which a broken wire fell across a trolley wire, and the current was conducted from the trolley wire to a tin roof, thence to a drain pipe, and from the drain pipe to a lead pipe in the house, by which persons were shocked. By somewhat similar means, a policeman who was trying the doors on his beat, and who had one hand on a door knob and the other upon a water spout, was knocked down by a current which came down the spout from the tin roof. There was a case in which a guy wire fastened to one of the city's poles conducted an electric light current to a signal box attached to the pole, and a boy whose attention was attracted to the box by sparks coming from it, and who placed his hand on it, was killed. Being asked how often such things happened, the witness answered that the bureau had crossed wires and other troubles to deal with more or less every day. Conditions of weather affected the wires somewhat. In stormy or windy weather they broke more or less. The amounts appropriated for the electrical bureau for the years 1889 and 1890 were, respectively, $103,844.69 and $137,803.15. The appropriation for fixed salaries was $35,800 for 1889, and $42,000 for 1890. Of the latter amount, $40,960 was expended. Upon cross-examination, Mr. Walker testified that the kind of poles put up by the defendant company would last, in ordinary circumstances, 10 or 12 years. The danger to life and property from the escape of electric currents had all arisen since the introduction of the electric light and trolley wires. The bureau had a great deal of trouble with wires that were originally erected by divers persons secretly and without authority, and which, being abandoned and allowed to fall down, were adapted to cause damage and to set fire to houses. There was little trouble with telegraph wires, because the larger number of them were on poles. The telegraph companies, in most cases, took down wires when they abandoned them. In the year 1889 the city had 5,117 poles and 903¾ miles of wire, and in 1890 it had 5,309 poles and 758 miles of wire. The city had from 1,500 to 2,000 points of communication; that is, places where the city officials or employés could use the city's wires for the purpose of signaling or telegraphing. In the years 1889 and 1890 the city employed, respectively, 12 and 14 men to inspect and take care of the city lines. In those years there were about 1,200 electric lights in the city. In 1897 the number of lights under the supervision of the bureau was 6,361. The electric light companies used their own poles and those of the city. A few of their wires were on the telegraph company's poles. The city also used the telegraph company's poles. For such use it paid nothing to the company. The ordinances au-

thorizing the construction of a line usually provided that the city should have the use of the poles without cost. As to the portion of the aforesaid amounts appropriated for the electrical bureau which could be regarded as applicable to the expenses of inspection of telegraph wires, such portion would include, for the year 1889, the amount of salaries for the year, and the sum of $11,000 for repairs; and, for the year 1890, the salaries for that year, and the sum of $12,079.19 for repairs; and also, for each year, the sum of $500 for horse keep, and a very small sum for stationery. Neither the draftsman, the batteryman, the assistant batteryman, nor the plumber, employed by the bureau, had anything to do with inspection of lines belonging to the telegraph company. Therefore the amounts of their salaries should be deducted from the portion of the appropriation applicable to expenses of inspection. George E. Wagner, also called by the plaintiff in rebuttal, stated that he was the president of a Philadelphia association of fire underwriters, had been vice president for a time and president for a time of another similar organization, and had been in the insurance business 31 years. He was asked the question following: "Q. Are you able to tell the court and jury to what extent, if at all, the introduction of electric wires overhead in a city, affects the liability to fire?" This question was objected to, the objection sustained, and an exception noted for the plaintiff.

The examination of witnesses being concluded, counsel for the plaintiff offered in evidence the ordinance of December 28, 1889, appropriating for salaries for the bureau of police the sum of $1,676,197.57, and a similar ordinance passed in the year 1888, in which the appropriation for salaries of police officers for 1889 was $1,657,300. This evidence was admitted against the objection of the defendant, and to its admission the defendant excepted. At the close of the evidence, counsel for the plaintiff stated that there was no dispute between counsel for the defendant company and himself over the proposition that, under all the testimony, the case should be passed upon by the court, and requested that a verdict be directed for the plaintiff. Counsel for the defendant company stated that he agreed with counsel for the plaintiff that the case should be decided by the court, but objected to the directing of a verdict for the plaintiff. On April 23, 1897, the court directed the jury to find for defendant.

E. Spencer Miller, for plaintiff in error.

Silas W. Pettit, for defendant in error.

Before SHIRAS, Justice, and ACHESON, Circuit Judge, and KIRKPATRICK, District Judge.

SHIRAS, Circuit Justice (after stating the facts). It must be regarded as settled that it is lawful for a state to impose taxes upon property owned and used within it by a corporation of another state, even when such corporation is engaged in interstate commerce, and that the exaction of a license tax is a valid exercise of power by municipal corporations, in order to cover expenses to which they may be put in the enforcement of their police rules and regulations. Telegraph Co. v. Attorney General, 125 U. S. 530, 8 Sup. Ct. 961; License Tax Cases, 5 Wall. 462; Wiggins Ferry Co. v. City of East St. Louis, 107 U. S. 365, 2 Sup. Ct. 257; Postal Tel. Cable Co. v. City of Charleston, 153 U. S. 692, 14 Sup. Ct. 1094. But these propositions are not disputed by the plaintiff in error. It is, in fact, conceded, that the charges in question were imposed under the police power, and are valid if they are reasonable in their amount and in their mode of collection. The claim is that such charges, to be reasonable, must be limited to such amount as is necessary to reimburse the municipality for the expenses to which it is subjected in the enforcement of such inspection rules and regulations as it may lawfully enact, and that

in the present case the amount of the charges imposed by the ordinances is excessive, and so far above the reasonable expenses of the city that the ordinances are void. Whether the ordinances are reasonable can be judicially inquired into. When it is said, in some of the cases, that such a question is for the determination of the court, it is not meant that the question may not properly be submitted to a jury. What is meant by such observations is that courts are not precluded from considering the reasonableness of the legislative act prescribing the terms and amount of the charges. It has sometimes been urged that such questions are peculiarly suited for legislative determination. And it must be admitted that there is a presumption in favor of the validity of the action of the legislative body, and that the evidence to justify a court in holding otherwise must be clear and convincing. Still, it must be regarded as conclusively settled that the legislative authority to impose license fees or charges is not absolute, and must be exercised with due regard to the rights of the corporations to be affected.

Regarding, then, the issue to be tried as one of fact, we think it is one which, from its nature, is eminently fit for the determination of a jury. The expenses attending direct regulations and oversight are not only to be considered, but also the incidental cost to which the municipality is subjected in providing for and maintaining a proper system of supervision. We cannot undertake to specify all the particulars which should be brought into view where the reasonableness of a municipal ordinance is challenged in a court; but we think that the rule laid down in Cooley, Const. Lim. (Ed. 1886) p. 242, may be safely adopted: "A municipal corporation may impose under the police power such a charge for the license as will cover the necessary expenses of issuing it, and the additional labor of officers and other expenses thereby incurred." While we think that the determination of such difficult questions of fact falls properly within the province of a jury, we do not mean to attribute error to the action of the court below in withdrawing the present case from the jury by giving a peremptory charge to find for one of the parties. That was done, as the record discloses, at the request of the counsel of both the parties, and, of course, would not present a proper ground of exception to such action of the court.

In speaking of the question as one specially suited for determination by a jury, we have reference to an action at law brought, like the present one, to enforce the provisions of an ordinance; not to a case where, by a suit in equity, the validity of the ordinance is assailed, and where, of course, the evidence is to be considered and the question determined by the chancellor. But whether the question is left to the determination of the jury, or, as in the present case, the court gives a peremptory charge, in either event a wide scope should be given to the admission of evidence. Not only is there a presumption in favor of the validity of the action of the legislative body, but the facts upon which that action proceeds are so numerous, and so liable to frequent changes, courts should act cautiously in dealing with such a case, and admit evidence of all facts and circumstances that seem to bear, even somewhat remotely, upon the issue. As was said by

the supreme court of Pennsylvania, in Allentown v. Telegraph. Co., 148 Pa. St. 119, 23 Atl. 1070, the amount of the license charges rests with the city councils in the first instance, and it is only where such discretion has been manifestly abused that the courts are justified in interfering.

In this view of the peculiar nature of the case, we think the trial court erred in excluding the evidence offered on behalf of the city, going to show that considerable additional expense, in providing a greater number of fire companies and apparatus, is rendered necessary by the electric wires suspended in the streets. If, indeed, a new condition of affairs has been caused by the erection of wires and poles in the thoroughfares of the city, which makes it proper for the authorities, in order to protect life and property, to increase its police and fire force and equipment, we think such a state of facts might be shown, and was a proper matter for consideration in fixing the amount of the license charges, and in passing upon their reasonableness. So, further, we think there was error in excluding the evidence offered of the expenses to which the city is, from time to time, put in connection with the meeting of its councils for the purpose of regulating the erection of wires and poles. Undoubtedly, there is force in the observation of the court, in rejecting this offer, that it was too remote, vague, and uncertain; and if the rejection had been placed upon that ground alone, leaving it open for the plaintiff to amend his offer, by making it more specific, we should not have felt inclined to overrule the action of the trial court in this particular. But this ruling must be considered in connection with that just previously made, and in which the court defined and restricted the field of inquiry in the following terms: "For the purposes of this trial, the evidence must be confined to the issue thus stated, 'that the license fee which can be sustained is only such as will legitimately assist in the regulation, and it should not exceed the necessary or probable expense of issuing the license, and of inspecting and regulating the business which it covers.'" We are unwilling, in a case like the present, to approve the total exclusion from consideration of expenses occasioned by the necessity of additional or more frequent meetings of the councils. What would be a proper allowance for such items it is not easy to say. But such expenses may be regarded, in a legal sense, as incurred at the request or instance of the companies whose business renders them necessary. The difficulty of estimating and apportioning such expenses is, no doubt, great; but it lies in the nature of the subject-matter, and does not warrant the contention of the companies that the license charges should not be influenced by any consideration of such necessary expenses.

By its reference to the previous case between the same parties, reported in 40 Fed. 615, we do not understand the trial court to have meant that the judgment in that case was conclusive of the present controversy. It was not so pleaded. On the contrary, it was merely claimed, in the affidavit of defense, that the judgment in the former case was conclusive in respect to the charges for the years 1886, 1887, and 1888. This was conceded by the plaintiff, and the present trial was restricted to the charges for the subsequent years, 1889 and 1890.

Nor was the record of the previous case put in evidence. Not having pleaded the former judgment as res adjudicata, and not having put in evidence the record, the defendant was in no position to demand that the former judgment should be regarded as conclusive in the present case. No such proposition was urged in the court below, nor is it before this court for consideration. Understood, then, as referring to the previous case as authority for holding the question of the reasonableness of the ordinances to be open to judicial inquiry, the observations of the court below were proper, and, indeed, as already said, such view of the law is not questioned by either of the parties. The first, second, and third assignments of error are sustained; the judgment of the circuit court is reversed; and the cause is remanded to that court, with directions to award a new trial.